IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 01-60265
_____

In The Matter Of: GULF CITY SEAFOODS, INC.,

Debtor,

_____

GULF CITY SEAFOODS, INC.,

Appellant,

versus

LUDWIG SHRIMP CO., INC.,

Appellee.
_____

Appeal from the United States District Court for the
Southern District of Mississippi
_____

July 11, 2002

Before GARWOOD, JOLLY and DAVIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This bankruptcy case deals with the interpretation and application of the "ordinary course of business" defense for a preferential transfer of funds. During the preference period, the debtor, Gulf City Seafoods ("Gulf City"), made numerous payments to one of its suppliers, Ludwig Shrimp Company ("Ludwig"). The bankruptcy court found that Gulf City had made most of these payments in the ordinary course of business and therefore refused

to avoid those payments.  The district court agreed and affirmed the judgment of the bankruptcy court.  Gulf City now appeals.

Gulf City argues that Ludwig failed to show that the payments in question were made "according to ordinary business terms" --  a necessary showing to establish the "ordinary course of business" defense.  11 U.S.C. § 547(c)(2).  Following other circuits, we hold that a party claiming that payments were made "according to ordinary business terms" must show that the payments in question fall somewhere in the range of payment practices of the relevant industry.  See, e.g., In re Tolona Pizza Prods. Corp., 3 F.3d 1029, 1032-33 (7th Cir. 1993).  In this case, the record reflects that Ludwig offered no such evidence.  Accordingly, we reverse the judgment of the district court with instructions to remand this case to the bankruptcy court for further proceedings not inconsistent with this opinion.

I

Gulf City was in the business of purchasing, processing, and reselling seafood products.  Ludwig supplied Gulf City with seafood.  The two parties had a longstanding business relationship. A peculiar feature of their relationship was Gulf City's method of paying Ludwig for its seafood.  Gulf City would take delivery of seafood and write Ludwig one or more checks for that delivery. Ludwig would not cash the checks right away.  Instead, Ludwig would cash the checks when Gulf City indicated that it had sufficient

2

funds in its account to cover the amount due on each respective check.  Before Gulf City filed for bankruptcy, on average, 40 to 45 days elapsed between the delivery of seafood and the date that the check (or checks) paying for that delivery cleared the bank.

On October 11, 1996, Gulf City filed for bankruptcy.  During the preference period -- which ran from July 13, 1996 through October 11, 1996 -- twenty-four checks payable to Ludwig cleared Gulf City's account.  Of these checks, seventeen cleared Gulf City's account within 40 to 45 days after their receipt.[1]  The remaining seven checks, totaling $86,113,[2] cleared Gulf City's account within ten to eighteen days after their receipt.

The bankruptcy court found, on the basis of past practices, that the checks that cleared Gulf City's account within 40 to 45 days after their receipt represented payments made in the ordinary course of business between Gulf City and Ludwig.  It therefore denied Gulf City's request to have the payments on these checks avoided.[3]  Gulf City appealed.  After reviewing this finding under

---

[1]Typically, there was a four-day lag between the date that Ludwig deposited a check and the date that the check cleared Gulf City's account.

[2]The bankruptcy court erroneously found that these checks totaled $86,313.

[3]In contrast, the bankruptcy court found that the seven checks that cleared Gulf City's account between ten to eighteen days after their receipt did not represent payments made in the ordinary course of business.  Accordingly, the bankruptcy court avoided these payments as preferential.  The district court affirmed this finding by the bankruptcy court.  Neither party appeals this part of the district court's judgment.

3

the clearly erroneous standard, the district court affirmed. Gulf City now appeals. "We review the decision of the district court by applying the same standards of review to the bankruptcy court's findings of fact and conclusions of law as applied by the district court." Kennard v. MBank Waco, N.A. (Matter of Kennard), 970 F.2d 1455, 1457 (5th Cir. 1992).

II

The bankruptcy code disfavors the transfer of the debtor's property in the ninety days before bankruptcy. Accordingly, the bankruptcy code allows the trustee to avoid such transfers. See 11 U.S.C. §§ 547(b)(1)-(5). The policy reasons underlying this statutory provision have been stated thusly:

> [T]o prevent the debtor during his slide toward bankruptcy from trying to stave off the evil day by giving preferential treatment to his most importunate creditors, who may sometimes be those who have been waiting longest to be paid. Unless the favoring of particular creditors is outlawed, the mass of creditors of a shaky firm will be nervous, fearing that one or a few of their number are going to walk away with all the firm's assets; and this fear may precipitate debtors into bankruptcy earlier than is socially desirable.

Tolona Pizza, 3 F.3d at 1031 (Posner, J.) (citations omitted). If, however, a preference period transfer was made "in the ordinary course of business," the bankruptcy code precludes the trustee from avoiding the transfer. 11 U.S.C. § 547(c)(2). In other words, the ordinary course of business defense provides a safe haven for a creditor who continues to conduct normal business on normal terms. Without this defense, the moment that a debtor faced financial

4

difficulties, creditors would have an incentive to discontinue all dealings with that debtor and refuse to extend new credit. Lacking credit, the debtor would face almost insurmountable odds in its attempt to make its way back from the edge of bankruptcy.

Although the policy behind the "ordinary course of business defense" is clear, the code recognizes that it may not always be easy to discern the difference between (1) payments that are truly "ordinary" between the debtor and the creditor and (2) payments that represent collusive arrangements designed to favor the particular creditor during the debtor's slide into bankruptcy. To address this practical problem, the bankruptcy code requires the creditor to satisfy three elements: The creditor must prove that the transfer was (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and (C) made according to ordinary business terms. 11 U.S.C. § 547(c)(2).

In sum, the creditor must show that as between it and the debtor, the debt was both incurred and paid in the ordinary course of their business dealings <u>and</u> that the transfer of the debtor's funds to the creditor was made in an arrangement that conforms with ordinary business terms -- a determination that turns the focus away from the parties to the practices followed in the industry.

Today, we focus on the third prong of the ordinary course of business defense: Whether Gulf City's payments to Ludwig were made "according to ordinary business terms."[4] Nearly all other circuits have held that a payment is "according to ordinary business terms" if the payment practices at issue comport with the standard of the industry. See Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.), 78 F.3d 30, 39 (2d Cir. 1996); Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.), 18 F.3d 217, 223 (3d Cir. 1994); Advo-System, Inc. v. Maxway Corp., 37 F.3d 1044, 1050 (4th Cir. 1994); Logan v. Basic Distrib. Corp. (In re Fred Hawes Org., Inc.), 957 F.2d 239, 243-44 (6th Cir. 1992); In re Midway Airlines, Inc., 69 F.3d 792, 797 (7th Cir. 1995); Jones v. United Sav. & Loan Ass'n. (In re U.S.A. Inns of Eureka Springs, Ark., Inc.), 9 F.3d 680, 683-84 (8th Cir. 1993); Sulmeyer v. Suzuki Pacific (In re Grand Chevrolet, Inc.), 25 F.3d 728, 733 (9th Cir. 1994); Clark v. Balcor Real Estate Finance, Inc. (In re Meridith Hoffman Partners), 12 F.3d 1549, 1553 (10th Cir. 1993); In re A.W. & Assocs., Inc., 136 F.3d 1439, 1442-43 (11th Cir. 1998). Under the holdings of these cases, the relevant inquiry is "objective"; that is to say, we compare the credit arrangements between other

_____

[4]Gulf City also argues that the payments at issue were not incurred or paid in the ordinary course of business dealings between Gulf City and Ludwig. We find no reversible error in the bankruptcy court's determination that these payments were "ordinary" as between Gulf City and Ludwig and therefore satisfied the first two prongs of the "ordinary course of business" defense. See 11 U.S.C. §§ 547(c)(2)(A)&(B).

6

similarly situated debtors and creditors in the industry to see whether the payment practices at issue are consistent with what takes place in the industry.[5]  By consistent, we do not necessarily mean identical.   In In re Tolona Pizza Products Corp., 3 F.3d 1029, 1032-33 (7th Cir. 1993), Judge Posner recognized that strict conformity to some industry standard may be inappropriate because credit arrangements will not be identical for every debtor and creditor in an industry.   Importantly, the law "should not push businessmen to agree upon a single set of billing practices." Id. at 1033.   In Judge Posner's view, "'ordinary business terms' refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad

---

[5]In making this showing, Ludwig should provide some evidence of credit arrangements of other creditors and debtors in the industry.  Following the Second, Sixth and Seventh Circuits, we hold that Ludwig cannot meet its burden under this objective test by simply showing that (1) its arrangement with Gulf City is similar to the credit arrangements Ludwig has with other debtors, or (2) the arrangement is similar to Gulf City's arrangements with other creditors.  See In re Roblin, 78 F.3d at 43; In re Midway Airlines, 69 F.3d at 797-98; In re Fred Hawes, 957 F.2d at 246 n.7 ("[I]n looking at industry standards, a court may also refer to the manner in which the parties conduct their business with other, unrelated parties.  This evidence alone, however, is insufficient to prove 'ordinary business terms' by a preponderance of the evidence.").  Therefore, Ludwig did not meet its burden of proof under § 547(c)(2)(C) by simply offering testimony that with its other customers, 35 days, on average, elapsed between the shipment of the seafood and payment.  The creditor, however, may satisfy its burden through testimony by its own company representatives about the practices of other creditors and debtors in the industry, subject of course to applicable evidentiary rules.  Whether such testimony is appropriately reliable is a matter best left to the bankruptcy court.

range should be deemed extraordinary and therefore outside the scope of subsection C." Id. (first emphasis in original).

We are in general agreement with the view expressed by Judge Posner, particularly that the statutory language should not be construed to place businessmen in a straightjacket. In any event, we will follow all the other circuits and adopt an "objective" test for deciding whether a payment arrangement was made "according to ordinary business terms"; that is, the question must be resolved by consideration of the practices in the industry -- not by the parties' dealings with each other.[6] Because "ordinary business terms" sets an outer boundary to the parties' practices, the ultimate question is simply whether a particular arrangement is so out of line with what others do that it fails to be "according to ordinary business terms." We leave this case by case determination where it belongs -- with the bankruptcy judge. We only say that the judge must satisfy himself or herself that there exists some basis in the practices of the industry to authenticate the credit arrangement at issue. Otherwise the practice cannot be considered an "ordinary" way of dealing with debtors.

A question remains: How should the bankruptcy court go about defining the relevant industry from which to draw the industry standard for challenged credit arrangements?

---

[6]This issue was left open by our decision in GasMark Ltd. Liquidating Trust v. Louis Dreyfus Natural Gas Corp. (In re Gasmark Ltd.), 158 F.3d 312, 318 (5th Cir. 1998).

8

Defining the industry whose standard should be used for comparison is not always a simple task. See Tolona Pizza, 3 F.3d at 1033 (questioning whether the appropriate industry included "the [sellers] of sausages to makers of pizza? The [sellers] of sausages to anyone? The [sellers] of anything to makers of pizza?"). In our view, for an industry standard to be useful as a rough benchmark, the creditor should provide evidence of credit arrangements of other debtors and creditors in a similar market, preferably both geographic and product.[7] We think that the industry benchmark inquiry is best illustrated by application: In this case, Ludwig might provide evidence, to the extent that it is reasonably available, of credit practices between suppliers to whom Gulf City might reasonably turn for its seafood supply and firms with whom Gulf City competes for consumers, from which a bankruptcy judge can determine whether there is some basis to find that the Ludwig-Gulf City arrangement is not a virtual stranger in the industry.[8]

---

[7]The Third Circuit has also suggested that the bankruptcy court should look to market definition principles from antitrust law to determine the relevant industry for comparison. See Molded Acoustical, 18 F.3d at 227 n.12.

[8]We recognize that there will be situations in which the debtor has only one or two companies to which it can reasonably turn for supplies or credit. In these cases, we are concerned that a creditor might not be able to show that its payment practices are "according to ordinary business terms" because the pool is too small to make such a determination. In these small market cases, the creditor may show similar credit arrangements in other local industries with similar characteristics. We leave it in the first instance to the bankruptcy court to decide whether a particular

9

Here, Ludwig offered no evidence of payment practices between other creditors and debtors, much less evidence of payment practices of other debtors and creditors in the same industry. Accordingly, the bankruptcy court clearly erred in finding that the seventeen payments at issue were made "in the ordinary course of business."[9]

### III

For the aforementioned reasons, we reverse the judgment of the district court and remand with instructions to remand to the bankruptcy court for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.

---

industry standard benchmark offered by the creditor satisfies the "objective" inquiry.

[9]On appeal, Gulf City also argues that the bankruptcy court incorrectly calculated the damages for the seven payments it found were not in the ordinary course of business. This argument is based on a misinterpretation of the bankruptcy court's finding. The bankruptcy court clearly concluded that seven specific payments, and only those payments, were not made in the ordinary course of business. In the light of this finding, the bankruptcy court's calculation of damages was clearly correct.